**UNITED STATES of America, Plaintiff,**

v.

**PALMER–SMITH COMPANY, Defendant.**

**Civ. A. No. 84–CV–73718–DT.**

United States District Court,
E.D. Michigan, S.D.

May 29, 1987.

---

Carolyn Bell Harbin, Detroit, Mich., R. Todd Luoma, Washington, D.C., for plaintiff.

Raymond J. Sterling, Andrew A. Paterson, Burke T. Lewis, Troy, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

On August 9, 1984, the United States brought suit against the Defendant, Palmer–Smith Company, for its failure to honor an Internal Revenue Service levy. In August of 1986, the Court allowed the Government to amend its Complaint and add a second cause of action (to wit, foreclosure of federal tax liens).

The issues were joined on September 23, 1986 when Palmer–Smith filed its answer. Shortly thereafter, both parties filed motions for summary judgment. Oral arguments were conducted on April 3, 1987. The motion was taken under advisement because of the need for additional briefing. The matter is now before this Court for resolution.

### I

Palmer–Smith is a Melvindale, Michigan general contract company which works within the commercial, industrial, and institutional construction industry. Kropf Mechanical Contractors, Inc. was utilized by Palmer–Smith as a subcontractor to perform mechanical work at the Epcot Center in Lake Buena Vista, Florida.

Palmer–Smith and Kropf entered into two subcontracts [1] for mechanical work. During the existence of the two subcontracts, the Secretary of the Treasury made assessments against Kropf for unpaid withheld income and Federal Insurance Contributions Act (FICA) taxes which totalled $2,379,787.58.[2] From 1982 to 1983, the

---

1. Subcontract 8105–13, which was signed on November 30, 1981, required Kropf to perform mechanical work for a lump sum amount of $1,380,000.00. Defendant's Exhibit B. Subcontract 8107–18, which was executed on January 4, 1982, obliged Kropf to do additional mechanical work for a lump sum amount of $3,222,- 200.00. Defendant's Exhibit C. Both contracts were identical except for amounts and descriptions of the construction work to be performed by Kropf.

2.

| TAXABLE PERIOD ENDED | DATE OF ASSESSMENT AND NOTICE & DEMAND | AMOUNT OF ASSESSMENT | UNPAID ASSESSED BALANCE* | DATE NOTICE OF TAX LIEN FILED** |
|---|---|---|---|---|
| 9/30/81 | 12/21/81 | $ 83,086.09(T) 11,433.84(P) 37,307.17(I) | $ 131,827.10 | 6/7/82 |

Government filed a series of notices of federal tax lien regarding these liabilities.

Subsequent to the completion of the work on subcontract 8105–13, Palmer–Smith terminated the mechanical work on subcontract 8107–18 on March 9, 1983. Palmer–Smith did so because it concluded that Kropf could not, and did not, fully perform its contractual obligation under this second subcontract. Palmer–Smith justified its decision on the basis of a provision within the second subcontract which allowed for the termination of the agreement at any time when Palmer–Smith be-

lieved that Kropf could not complete its obligations under Article 6 of the General Terms and Conditions of Subcontract 8107–18.[3]

In defense against the claims of the Government, Palmer–Smith asserts that Kropf's failure caused it to hire other subcontractors to do the same work which resulted in an economic loss of $624,085. In an effort to recover a portion of its loss on the second subcontract, Palmer–Smith set off the sum of $95,850 against the balance due Kropf under the first subcontract 8105–13 on March 12, 1983. This

| TAXABLE PERIOD ENDED | DATE OF ASSESSMENT AND NOTICE & DEMAND | AMOUNT OF ASSESSMENT | UNPAID ASSESSED BALANCE* | DATE NOTICE OF TAX LIEN FILED** |
|---|---|---|---|---|
| 12/31/81 | 3/30/82 | $ 474,044.11(T)<br>21,863.66(P)<br>80,591.02(I) | $ 576,498.79 | 7/28/82 |
| 3/31/82 | 6/28/82 | 543,139.58(T)<br>50,181.94(P)<br>85,727.72(I) | 679,049.24 | 9/7/82 |
| 6/30/82 | 9/27/82 | 207,659.42(T)<br>8,815.48(P)<br>29,640.95(I) | 246,115.85 | 12/10/82 |
| 9/30/82 | 12/20/82 | 683,907.98(T)<br>23,886.29(P)<br>38,502.33(I) | 746,296.60 | 3/16/83 |
| | | TOTAL: | $2,379,787.58 | |

\* Plus accrued interest and penalties as allowed by law.

\** Notice of Federal Tax Liens filed with the Register of Deeds, Wayne County, Michigan.

(T) Denotes tax assessed.

(P) Denotes penalty assessed.

(I) Denotes interest assessed.

3. Article 6 reads:

The subcontractor shall do the work with promptness and diligence in strict compliance wih this Subcontract and pursuant to any directions of the Company or its Superintendent. If, in the opinion of the Company, the Subcontractor shall fail to perform the work in strict compliance with this Subcontract, or in any manner breach this Subcontract or engage in any bankruptcy, insolvency or arrangement proceeding, whether voluntary or involuntary, or upon cancellation for any reason of the Company's contract, or upon the occurrence of any disaster, act of any governmental body or other event, occurrence, or condition beyond the control of the Company, making, or tending to make performance of the work impractical or impossible, then the Company may, without relinquishing any other remedies it may have: (a) Take over and enter on and perform, correct, repair or redo the work or hire others to do so, and to use in connection therewith all tools, machinery, equipment, materials, and subcontracts of the Subcontractor; and, to continue such performance for so long as it may deem necessary, and to charge to the Subcontractor all expense and damages the Company may incur in connection with the performance, correction, repair or redoing by it of such work or the work of other subcontractors which has been injured or altered by such performance, correction, repair or redoing of the work, even though the same may exceed the Subcontract amount, or

(b) Terminate and cancel the Subcontract by written notice to the Subcontractor, and it is agreed that in the event of such a cancellation and termination, that the Subcontractor shall receive as full payment for the portion of the work completely performed in full compliance with this Subcontract, as determined by the Company, the progress payments actually paid to the Subcontractor at the date of termination plus that percentage of the progress accrued payments retained by the Company less the amount of damages, as determined by the Com-

setoff was explicitly executed pursuant to Article 3, Paragraph E of the General Terms and Conditions of Subcontract 8105–13.

On March 16, 1983, the Internal Revenue Service (IRS) served a notice of levy on Palmer–Smith with respect to the federal tax liabilities of Kropf. Approximately two weeks later (March 30, 1983), the IRS served a final demand on Palmer–Smith regarding the notice of levy.

## II

The principal statutory provisions in this cause are 26 U.S.C. §§ 6321 and 6322. 26 U.S.C. § 6321 essentially provides that if a taxpayer neglects or refuses to pay a tax after a demand has been made upon him, the amount "shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."[4] 26 U.S.C. § 6322 simply determines that a lien, which was imposed under 26 U.S.C. § 6321, arises at the time when the assessment is made.

The central question in this case is whether Palmer–Smith possessed any property in which Kropf had a right. According to the Sixth Circuit Court of Appeals, in *United States v. Bank of Celina,* 721 F.2d 163, 169 (6th Cir.1983), "state law controls the issue of whether property exists to which a tax lien may attach in the first instance." Kropf's right to payment (if any) is based upon its contractual relationship with Palmer–Smith. Thus, state contract law principles are determinative of any of Kropf's possible property rights that it may have possessed in the contested funds. The Government bears the burden of showing that Palmer–Smith had possession of the property of Kropf. *Hall v. United States,* 258 F.Supp. 173, 174 (D.Miss.1966).

Two provisions of the first subcontract (8105–13) are particularly important to the parties. Article 3(c) of the Subcontract General Terms and Conditions specifies:

(c) The final balance due the Subcontractor shall be payable thirty days, or such other period specified in the [contract documents,] after completion and acceptance of all the work required by the [contract documents] and of approval of the final estimate and receipt of final payment from the Owner; provided, however, that such final balance shall not be paid in any event until the Subcontractor has proved to the satisfaction of the Company that all labor, materials, equipment and services or any other obligation for which he is responsible, used in performance of or connected with this Subcontract, have been paid for in full, that there are no liens or claims, present or contingent, against the work, the Company or the Owner; and that the work has received the approval of the Architect Engineer and the Owner; provided, further that the final balance due shall be reduced by the amount of any backcharges or other amounts withheld under any provision of this Subcontract; provided, further, that in the event the Subcontractor shall engage in any bankruptcy, insolvency, or arrangement proceeding, voluntary or involuntary, the Company may withhold the final balance, or any other payments, until expiration of the period of any guarantees required of the Subcontractor and Company may use and apply out of such final balance the amount necessary to satisfy any claims or costs arising out of such guarantees. *The Subcontractor shall have no property interest in, or right to, such payment, nor any other payment hereunder until received by him.*

(Emphasis added). On its face, this last sentence, which has been underlined, appears to indicate that Kropf had no claim to the monies that are held by Palmer–Smith.

---

pany, of any nature arising out of or connected with a breach of this Subcontract.

**4.** 26 U.S.C. § 6321 reads:

If any person is liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

Article 3(e) of Subcontract 8105–13 reads:

(e) The Company may withhold any or all amounts otherwise due under this Subcontract at any time the Company shall deem it necessary to protect itself against claims, damages, losses or expenses from any of the following causes defective work not remedied: claims filed, or reasonable anticipated, against the Company, the Owner or the real estate and/or improvements involved in the work, failure by the Subcontractor to promptly pay without reasonable justification the labor, material, equipment, services and subcontractors used in the performance of the work; reasonable doubt that the work can be completed for the unpaid balance of the contract sum, or within the period called for by any schedule of progress; failure to perform the work in strict compliance with the Subcontract in a manner acceptable to the Architect/Engineer, the Owner and the Company, damages to, or claims by or against the Company (whether presently determined or reasonably anticipated) in any way *arising out of this or any other Subcontract agreement* between the company and the Subcontractor, or out of any act or omission by the Subcontractor causing damage to the Company, and the Company may apply any such amounts so withheld to the satisfaction of any such claims, damages, losses or expenses, and any such amounts so applied shall be deemed payments made on the contract price, and, provided, further, that Subcontractor shall have no property interest in, or right to, such amounts so withheld.

(Emphasis added). The affidavit of Robert Birdsall, controller of Palmer–Smith, indicates that the $95,850.00 at issue was withheld pursuant to this subcontract provision shortly after Kropf's mechanical work activity had been terminated.

In its Motion for Summary Judgment, Palmer–Smith initially argues that the primary rule of construction under Michigan contract law is to determine the intent of the contracting parties. *Amoco Oil Company v. Kraft*, 89 Mich.App. 270, 273, 280 N.W.2d 505 (1979). Clear and unambiguous language should be given its plain meaning. *Geerdes v. St. Paul Insurance Co.*, 128 Mich.App. 730, 733–34, 341 N.W.2d 195 (1983). Palmer–Smith asserts that an application of these rules to the subcontracts shows that Kropf never had a property interest in the amount withheld.

Moreover, Palmer–Smith notes that Article 3(e) within the two subcontracts provide that the "Subcontractor shall have no property interest in, or right to, such amounts so withheld." Palmer–Smith also relies upon Article 3(c) within the two subcontracts which read:

The Subcontractor shall have no property interest in, or right to, such payment, nor any other payment hereunder until received by him.

Palmer–Smith next argues that when the Government has a federal tax lien, it is deemed to stand in the taxpayer's shoes and can only recover what the taxpayer could get in a direct action against Palmer–Smith. *United States v. Varani*, 780 F.2d 1296, 1304 (6th Cir.1986). Palmer–Smith then concludes:

If Kropf sued Defendant to recover the withheld $95,850.00 on subcontract 8105–13, under Michigan contract law, Defendant would first be entitled to deduct its entire $624,085.00 loss from subcontract 8107–18. Since the loss on subcontract 8107–18 greatly exceeded the withheld amount on subcontract 8105–13, Kropf would recover zero in a direct action. In short, under Michigan contract law, Defendant did not hold any of Kropf's property or rights to property subject to attachment.

Defendant's Brief at 5–6.

In their Supplemental Brief, Defendant asserts that this case is virtually identical to *Atlantic Refining Co. v. Continental Casualty Co.*, 183 F.Supp. 478 (W.D.Pa. 1960), where the court sought to determine whether a construction contractor had a property interest in "retainage" that had been held by a building owner pursuant to a construction contract. The court held that the contractor, who (a) failed to pay

the laborers, (b) breached his contractual obligations to the owner, and (c) authorized the owner to withhold the consideration, was without any right to the money that had been retained and withheld by the treasurer. Since the court concluded that the contractor had no property right to those monies which had been withheld by the owner, it was determined that the Government lien never attached on the owner.

■ Although there are similarities between *Atlantic Refining* and the instant cause, there are significant dissimilarities. Here, there is evidence to suggest that (1) Kropf fully performed all of its obligations under the first subcontract, and (2) the monies, which were ostensibly earned by Kropf under the first subcontract, were retained by Palmer–Smith to pay for those damages which arose from the breach of the second subcontract. The Government asserts that Palmer–Smith has created a situation whereby it is simply using a sophisticated "collection device" to set off the debt on the second subcontract against the monies owed to Kropf under the first subcontract. Thus, according to the Government, its lien follows along with any transfers of Kropf's property. *United States v. Bank of Celina*, 721 F.2d 163, 169 (6th Cir.1983). Moreover, the Government argues that Article 3(c) does not mean what it says, in that a literal interpretation of the provision would render the contract without consideration because Kropf could never enforce its right to be paid. Even assuming that the Government is correct in asserting that the last sentence of Article 3(c) must essentially be nullified, this Court believes that the Government's liens did not attach.[5]

The Government submits that the controlling contact provision is actually Paragraph 4 of the contract which says that Palmer–Smith:

> agrees to pay subcontractor (the taxpayer) for the satisfactory performance of this subcontract the firm lump sum amount of: ONE MILLION, THREE HUNDRED EIGHTY THOUSAND AND 00/100 DOLLARS subject to written authorized additions or deductions from such amount.

The Government says this provision makes clear that Kropf had a property interest in the funds from the first subcontract on the basis of its satisfactory performance of that subcontract.

Notwithstanding this contention, Paragraph 4 of the subcontract does not simply say that Kropf is entitled to this money upon satisfactory performance. It says that payment is "subject to written authorized additions or deductions from such amount." Palmer–Smith's Exhibit D consists of the written change in Kropf's subcontract which embodies the deduction of the $95,850. Thus, the key paragraph, which has been relied upon by the Government, actually makes clear that Kropf had no right to the contested money until such deductions or additions were made.

The Government asserts that Exhibit D is not a proper authorization form because it was unsigned by Kropf. Although the Government is correct in noting that the authorization form was not signed by Kropf, there is no evidence of any requirement that Kropf approved the withholding of the funds. In fact, the withholding was done pursuant to Article 3(e) which specifically says that "[t]he Company may withhold ..." and makes no mention of a requirement that Kropf must execute the document (i.e., authorization form). It would be anomolous if a clause, which was designed for Palmer–Smith's protection

---

5. The Court notes that where possible, courts are to construe a contract so as not to nullify a clause. *See e.g. Remes v. Holland,* 147 Mich. App. 550, 558, 382 N.W.2d 819 (1985); *DeBoer v. Geib,* 255 Mich. 542, 544, 238 N.W. 226 (1931). Thus, there is a strong presumption against the Government's interpretation which essentially results in the neutralizing of the last sentence of Article 3(c). As a result, this sentence can be seen at a minimum as expressing the parties'

intentions that Palmer–Smith maintain the sole interest in the retained fund until all the time periods and obligations which were outlined in Article 3(c) were satisfied. Only then was Kropf entitled to payment. Given this intention, Kropf never had a right to the fund. Thus, the Government lien did not attach. However, this Court believes that Palmer–Smith should prevail even if the Government's view of Article 3(c) is adopted.

from potentially detrimental actions of Kropf, was dependent on Kropf's approval. In addition, the Government has no standing to object to the method of withholding since it was not a party to the contract.

Assuming that Kropf did satisfactorily perform its obligation under the first subcontract,[6] and ignoring Article 3(c), the provision which has been relied upon by the Government makes clear that any right to payment of Kropf is conditional or "subject to" other deductions. At best, Kropf had a potential right to payment at a later date after all of the proper and necessary deductions under Article 3(e) were made. Since Kropf had no property interest, the Government has no lien at the present time. Paragraph 4 is also significant because it shows that Kropf did not even have a property interest *before* Palmer–Smith formally withheld the money.

Although the contract clauses at issue here are not a part of a typical agreement, they still allow money to be retained by Palmer–Smith for certain purposes. There is no reason why the money, which has been retained pursuant to one subcontract, cannot be set off against debts of another subcontract when there is a contractual provision allowing such an action. Thus, this is not simply a kind of set off for collection purposes, as alleged by the Government. Instead, Palmer–Smith never owed the money to Kropf because its contract clearly allowed it to deduct the funds from the first subcontract.

In *United States v. Bess,* 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958), Justice Brennan said of a federal tax lien that:

> It would be anomolous to view as "property" subject to lien proceeds never within the insured's reach to enjoy …

*Id.* at 55–56, 78 S.Ct. at 1057–58. He, therefore, concluded that the Government had no right to those insurance proceeds which could not have been obtained until the beneficiary's death. Here, the Government seeks funds that were never within

Kropf's reach because they were always "subject to" reasonable deductions.

Palmer–Smith is correct when it asserts that this case is similar to *Pittsburgh National Bank v. United States,* 657 F.2d 36 (3d Cir.1981), in which the court held that a government lien did not attach when the bank exercised its set off right prior to the placement of the lien. This case is even stronger than *Pittsburgh,* in which the depositor had some right to control the funds prior to the set off. Here, Paragraph 4 and other provisions within the subcontracts make clear that Kropf was never entitled to control this balance. The fact that the disputed fund was deducted from a balance does not mean that Kropf was entitled to receive the funds. The deduction only meant that the fund consisted of money which may be owed to Kropf at a later date. The case of *United States v. Bank of Celina,* 721 F.2d 163 (6th Cir.1983) is distinguishable because the bank had maintained the property of the depositor subject to his right of withdrawal when the lien was filed. Here, Palmer–Smith never possessed Kropf's property.

■ Finally, the Government argues that, at a minimum, Kropf had a right *in quantum meruit* for payment on the work that it had completed. This position is incorrect, in that Michigan law forbids a *quantum meruit* recovery where an express contract already covers the subject matter. *See Boughton v. Boughton's Estate,* 111 Mich. 26, 27–28, 69 N.W. 94 (1896); *Superior Ambulance Service v. Lincoln Park,* 19 Mich.App. 655, 663, 173 N.W.2d 236 (1969) ("there can be no recovery in *quantum meruit* upon an implied contract where an alleged express contract, in substance, covers the same subject matter"). Here, the express contract explicitly made payment subject to "authorized deductions." Kropf had no matured right to *quantum meruit* recovery because any such right was contingent on the deductions. The Government concedes that there is an express contract which covers

---

6. Palmer–Smith has not conceded that it would have paid the disputed amount to Kropf but for this one deduction. The parties agree that Michigan contract law applies in this case. However, the result would be no different under Florida law.

the relationship between Palmer–Smith and the taxpayer. Hence, the *quantum meruit* argument must be rejected. The Government liens never attached.

Accordingly, Palmer–Smith is clearly entitled to judgment as a matter of law for the reasons which have been set forth in this Opinion.

IT IS SO ORDERED.